UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:13-cr-28-HSM-SKL |
| ) | |
| DAVID GLENN HELTON, ) | |
| ) | |
| Defendant. ) | |

## REPORT & RECOMMENDATION

Before the Court is a motion to suppress filed by Defendant David Glenn Helton ("Defendant") [Doc. 34]. Defendant seeks to suppress all evidence seized during the search of his vehicle claiming his Fourth Amendment rights were violated because his daughter had neither actual nor apparent authority when she consented to the search of his vehicle. In addition, under a fruit-of-the-poisonous-tree theory, Defendant seeks to suppress all evidence obtained subsequent to the vehicle search, including his confession. Plaintiff United States of America ("the government") has filed a response in opposition to the motion [Doc. 38].[1] Finding no constitutional violation, I **RECOMMEND** that Defendant's motion to suppress be **DENIED**.

**I.     FACTUAL BACKGROUND**

During the evidentiary hearing held on July 28, 2014, the government presented the testimony of Secret Service Agent Darren Earle and Shelbyville Police Department Detective Sergeant Brian Crews. Detective Crews has been an officer with the Shelbyville Police

---

[1] The motion to suppress was referred for a report and recommendation pursuant to 28 U.S.C. § 636(b) [Doc. 35].

Department for 14 years and Agent Earle has been an agent with the Secret Service for 17 years. Both have extensive experience investigating fraud cases. Agent Earle and Detective Crews testified consistently to the facts surrounding the consensual search of Defendant's vehicle and their credibility is not contested by Defendant; rather, he denies that his daughter had either actual or apparent authority to give such consent. Pertinent testimony from the hearing is summarized below.[2]

The investigation that led to the indictment of Defendant began on May 16, 2013, when Detective Crews received a call from Michelle Stone, a fraud investigator with Ascend Federal Credit Union ("Ascend"). Ms. Stone reported the receipt of a potentially fraudulent Shelbyville Police Department report concerning a loan to Virginia Hartlein, Defendant's ex-wife. The police report claimed that the loan made in Ms. Hartlein's name was secured without her knowledge. Detective Crews confirmed the report was fraudulent.

On June 11, 2013, Detective Crews contacted Agent Earle for assistance with the investigation. On June 11 and 12, Agent Earle conducted various interviews of law enforcement officers and database searches in furtherance of the investigation and discovered information about fraudulent deeds, outstanding loans, false documents, and other potentially incriminating evidence concerning the activities of Defendant, Ms. Hartlein, and/or their daughter, Emily Helton. Agent Earle then interviewed Ms. Stone at Ascend on June 13, 2013, and she provided Agent Earle with more information and documents concerning bogus loans for a tractor and W-2's from Birgeron Investment Group ("Birgeron"), among other documents. While Agent Earle did

---

[2] Five exhibits were entered into evidence during the evidentiary hearing: home loan documents and Kubota tractor loan documents from Ascend Federal Credit Union [Government's Exhibit 1], documents obtained from Emily Helton's vehicle [Government's Exhibit 2], documents obtained from Emily Helton's residence [Government's Exhibit 3], a facsimile of a fraudulent police report received by Ascend Federal Credit Union [Government's Exhibit 4], and a facsimile of a fraudulent police report received by Equifax [Government's Exhibit 5].

not file a separate report on his communications with Ms. Stone, he believed there was sufficient evidence to begin an investigation of Defendant. He also concluded the false police report was prepared on a computer.

Later on June 13, 2013, Agent Earle and Detective Crews went to Ms. Hartlein's residence. Ms. Hartlein denied that Defendant lived at her residence, although he recently had been arrested there on charges stemming from his allegedly fraudulent activities in Georgia. Defendant remained in custody in Georgia. Ms. Hartlein acknowledged that Defendant's car, a leased Chevy Malibu, was parked at her house, but she said she did not drive the car or have the keys. Ms. Hartlein said her daughter had the keys to Defendant's car. Ms. Hartlein affirmed the Ascend loan was hers, but denied knowing anything about the submission of a false police report.

During the interview, Ms. Hartlein received a telephone call from her daughter, Ms. Helton. Agent Earle asked Ms. Helton to come to her mother's residence and she did so. When Ms. Helton arrived and was asked about the tractor loan, she admitted to signing the bill of sale as "Emily Williams" but said she did not sell a tractor. "Williams" is Ms. Helton's fiancé's surname. Ms. Helton stated she was employed by Birgeron and her main job duty was to sell promissory notes. Ms. Helton was unable to answer any of Agent Earle's questions about the functioning or structure of Birgeron. Agent Earle asked for and received consent to search Ms. Helton's Jeep Wrangler, in which he discovered business cards from Birgeron bearing Ms. Helton's name, promissory notes, title information, deed information and agreements, and collateral paperwork. Agent Earle eventually determined the promissory notes were related to the criminal charges pending against Defendant in Georgia.

When asked about Defendant's laptop or other computer equipment, Ms. Helton stated Defendant had a laptop, but she did not know the whereabouts of his laptop. She also stated that

pursuant to Defendant's request, she had picked up documents from his storage unit to store them in her home. She admitted that she had Defendant's car keys at her residence, which was approximately 20 minutes from Ms. Hartlein's residence where Defendant's car was parked. Agent Earle also learned that upon Defendant's earlier arrest at his ex-wife's residence, Defendant gave Ms. Helton his car keys and asked her to back his car into Ms. Hartlein's driveway. Ms. Helton moved the car as Defendant had asked her, by parking the Malibu in a "bump out" on the driveway, where it would not obstruct the movement of other cars into and out of the garage.

The officers and Ms. Helton then went to her house. While at her residence, Ms. Helton gave written consent allowing a search of her home. Among the documents seized at Ms. Helton's residence were the documents she retrieved from Defendant's storage unit, including blank W-2 statements, completed W-2 statements in the name of Defendant with Defendant's employer list as Birgeron, a bill of sale with no signature for a Kubota tractor, and a picture of a Kubota tractor.

After the search of Ms. Helton's home, she and the officers returned to Ms. Hartlein's residence with the keys to the Malibu. Peering into Defendant's car, Detective Crews saw a black laptop bag and documents in plain view through the window of the locked Malibu. Ms. Helton cooperatively used the keys to open one of the Malibu's doors and consented to a search of the Malibu. The officers did not ask Ms. Helton to provide written consent for the search of the Malibu. Neither officer asked about, or knew, who held insurance on the Malibu or whether Ms. Hartlein or Ms. Helton had Defendant's permission to drive the Malibu. Ms. Hartlein did not drive the Malibu. There was no indication Ms. Helton had driven the Malibu other than to move and park it out of the way at Ms. Hartlein's home upon Defendant's arrest there.

Upon searching the Malibu, the officers located a laptop, a green thumb drive containing

scans of driver's licenses that pertained to a different scheme, a notary stamp, and loan documents. Coincidentally, after the search of the Malibu, a rental company arrived to repossess the laptop and a game system found in the Malibu due to nonpayment. The rental company informed the officers that Ms. Helton had rented the laptop and game system found in the Malibu. The next day, on June 14, 2013, Agent Earle seized Ms. Helton's Jeep Wrangler and a typewriter, and Ms. Helton signed a *Miranda* rights waiver and abandonment forms for the Jeep Wrangler and typewriter. Thereafter, Ms. Helton began driving the Malibu.

A month later, in August 2013, Agent Earle interviewed Defendant, who was still in custody in Georgia, in the presence of Defendant's lawyer about the Ascend loan and other matters. Defendant allegedly made incriminating statements, which the government plans to introduce in its case in chief. At this time, the government does not intend to introduce in its case in chief any of the items discovered during the search of the Malibu. Defendant is indicted in this case on two counts of financial institution fraud and four counts of making a false statement to a federally insured credit union [Doc. 1].

## II. ANALYSIS

Defendant argues that the search of his vehicle was illegal because his daughter did not have the authority, either actual or apparent, to consent to the search. Defendant therefore argues that all evidence obtained by police both during and after the search of his vehicle, including his confession, should be suppressed.

Warrantless searches violate the Fourth Amendment, unless an applicable exception exists, such as consent. *See Schneckloth v. Bustamonte*, 412, U.S. 218, 219 (1973). "It is the Government's burden by a preponderance of the evidence, to show through clear and positive testimony that valid consent was obtained." *United States v. Hinojosa*, 606 F.3d 875, 881 (6th
5

Cir. 2010) (internal quotation marks omitted). "[P]ermission to conduct a warrantless search may be given not only by the owner of the property, but also by 'a third party who possessed common authority over or other sufficient relationship to the premises or effects to be inspected.'" *United States v. Attar*, No. 89-5659, 1990 WL 102876, at *2 (6th Cir. July 24, 1990) (quoting *United States v. Matlock*, 415 U.S. 164, 171 (1974)). A third party's ability to consent "derives not from any property interest the third party may have in the property, 'but rests rather on mutual use of the property by persons having joint access or control for most purposes . . . .'" *Id.* (quoting *Matlock*, 415 U.S. at 172 n.7).

"Under the *Matlock* test, the driver of an automobile generally has apparent authority to consent to a search of the vehicle," because:

> The driver has immediate possession and control over the vehicle and ordinarily has access to all internal and external compartments. Under those circumstances, it is reasonable to assume that he has authority to consent to a search. Even if it turns out for some reason that the driver did not have actual authority to consent, the fruits of the search need not necessarily be suppressed. "[A] search is not invalidated where a police officer in good faith relies on what reasonably, if mistakenly appears to be a third-party's authority to consent to the search." *United States v. Sledge*, 650 F.2d 1075, 1080-81 (9th Cir. 1981). *See also United States v. Miller*, 800 F.2d 129, 133-34 (7th Cir. 1986); *United States v. Hamilton*, 792 F.2d 837, 842 (9th Cir. 1986). Thus, a driver of an automobile is presumed to have authority to consent to a search of the vehicle unless facts come to the inspecting officer's attention which would suggest that the driver's consent is invalid. *See, e.g., United States v. Pardon*, 657 F. Supp. 840, 846-48 (D. Del. 1987), aff'd. without opinion, 857 F.2d 1466 (3d Cir.), cert. denied, --- U.S. ----, 102 L.Ed.2d 547 (1988). See also *United States v. Impink*, 728 F.2d 1228, 1234 (9th Cir.1984).

*Attar*, 1990 WL 102876, at *2.

The key question involved in determining whether apparent authority existed "is not whether the officers were *certain* that [the third party] exercised 'joint access or control for most

purposes,'" but rather, "it is whether there was enough *uncertainty* to undermine the officers' 'reasonable . . . belief that [she] had authority to consent.'" *United States v. Purcell*, 526 F.3d 953, 967 (6th Cir. 2008) (second and third alterations in original) (citations omitted). In considering whether consent was made by a third party with apparent authority, the court uses an objective standard to determine if the officers reasonably believed that the third party had actual authority to consent based on the facts available at the time of the search. *United States v. Kimber*, 395 F. App'x 237, 243-44 (6th Cir. 2010) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990); *United States v. Morgan*, 435 F.3d 660, 663 (6th Cir. 2006)). Thus, "a search consented to by a third party without actual authority over the premises is nonetheless valid if the officers reasonably could conclude from the facts available that the third party had apparent authority to consent to the search." *United States v. Ayoub*, 498 F.3d 532, 537 (6th Cir. 2007) (citing *Rodriguez*, 497 U.S. at 186-89).

When courts have addressed whether a third party had apparent authority to consent to the search of a vehicle, they have found the fact that the third party was driving the vehicle to mean that the third party "was in immediate possession and control of the vehicle," which gave the third party "apparent authority to give consent." *United States v. Valencia*, No. 8:12CR30, 2012 WL 3104848, at *5 (D. Neb. June 29, 2012), *report and recommendation adopted by* No. 8:12CR30, 2012 WL 3104847 (D. Neb. July 30, 2012); *see also United States v. Hunter*, 663 F.3d 1136, 1144 (10th Cir. 2011) (finding that the third party "was legally driving the rental car, with a legal driver's licen[s]e, and she was as entitled, apparently or in fact, as [the defendant] to consent to a search of the car"); *United States v. Scott*, No. 10-00027-01-CR-W-ODS, 2011 WL 5387569, at *4 (W.D. Mo. Oct. 3, 2011). Courts have also found third parties to have apparent authority to consent to a search in other situations, such as where the third party is the wife of the

7
Case 4:13-cr-00028-HSM-SKL   Document 40   Filed 08/11/14   Page 7 of 11   PageID #: 123

driver who "acted as if she had control over the car," *United States v. Perez-Guerrero*, No. 11-40101-01-RDR, 2012 WL 683201, at *10 (D. Kan. Mar. 2, 2012), where the third party is merely married to the owner of the vehicle, *United States v. McGregor*, No. CR-05-00403 RMW, 2006 WL 997088, at *5 (N.D. Cal. Apr. 17, 2006), and where the third party had the keys to the vehicle, *Scott*, 2011 WL 5387569, at *4; *Krug v. County of Rennselaer*, No. 1:04-CV-0640, 2010 WL 3937319, at *5 (N.D.N.Y. Oct. 5, 2010).

In this case, the officers knew that Defendant had given Ms. Helton the keys to his car, knew Ms. Helton kept the keys at her home, knew that Defendant had instructed Ms. Helton to move the vehicle into the driveway of Ms. Hartlein's home, and knew that Ms. Helton had done just that. Furthermore, Ms. Helton unlocked and opened the doors to the car to allow the officers to search it when she consented to the search. All of these factors weigh in favor of Ms. Helton having at least apparent authority, if not actual authority, to consent to the search of the vehicle.

The Sixth Circuit case cited by Defendant during the hearing, *United States v. Waller*, 426 F.3d 838, 849 (6th Cir. 2005), held that a resident of an apartment did not have actual authority to consent to the search of a defendant's closed, zipped suitcase, and, because it was unclear whether the defendant's suitcase was subject to mutual use by the resident, the officers were not entitled to search the suitcase without further inquiry. The court emphasized that because the police knew that the defendant was storing belongings in the apartment, and because "[m]ost people do not keep a packed, closed suitcase in their own apartment," the officers exhibited "deliberate ignorance of conclusive ownership," which "does not excuse the warrantless search of the suitcase, especially when actual ownership could easily have been confirmed."

The instant facts are distinguishable from those in *Waller*. *Waller* focuses on whether a

third party had authority to consent to the search of a container located within an area over which the third party did have authority to consent to search. Specifically, *Waller* focuses on a situation in which officers had reason to know that the third party did not have authority to consent to the search of the closed, zipped suitcase—because they knew the defendant's belongings were in the apartment, and they should have known that most people do not keep a packed, zipped suitcase in their own closet. Here, the officers did not have any indication that Ms. Helton did not have authority to consent to a search of the car, since she had the keys to the car. A car is different than a closed, zipped suitcase, in that people often drive vehicles belonging to family members or friends. *See In re Strange*, 424 B.R. 584, 592 (Bankr. M.D. Ga. 2010) ("Car buyers commonly anticipate the vehicle they purchase sometimes may be used by others, especially family members."); *In re Cross*, 376 B.R. 641, 648 (Bankr. S.D. Ohio 2007) ("[A] typical family [has] multiple vehicles used by both husband and wife interchangeably as necessary and practical under the circumstances."). Thus, *Waller* is distinguishable and not on point here, as the officers had no reason to doubt Ms. Helton's authority to consent to the search.

After completion of the hearing, Defendant submitted one additional, non-binding case citation in support of his argument. In *State v. Kurokawa-Lasciak*, a casino reported the defendant to police for theft. 278 P.3d 38 (Or. Ct. App. 2012). An officer detained the defendant in the parking lot of the casino as he was walking away from a van. After arresting the defendant, the officer asked him for consent to search the van, but the defendant refused. The officer repeated his request to search the van, and also asked for consent to search the defendant's pockets and his room at the casino. The defendant stated that he wanted a lawyer. The defendant was then taken to jail, leaving the van in the casino parking lot. The officer later learned that the defendant had given the keys to the van to his girlfriend, and that he had

9
Case 4:13-cr-00028-HSM-SKL   Document 40   Filed 08/11/14   Page 9 of 11   PageID #: 125

"instructed her to lock the van, take care of the family dog, go to the casino's restaurant to eat, and stay put until he returned." *Id.* at 40. At the casino's restaurant, the officer asked the defendant's girlfriend if she would consent to the search of the van. She "hesitated and told [the officer] that she was not sure if she could consent because she was not listed on the rental agreement." *Id.* When she later met the officer near the van, she told him that she was feeling "badgered," and the officer denied badgering her. *Id.* She eventually gave consent to search the van. The Court of Appeals of Oregon held that while the defendant had given his girlfriend the key, he had narrowly limited her authority to only "extracting the family dog, locking the van, and keeping it locked," "and those limitations did not encompass consenting to a search." *Id.* at 44.

The facts here are distinguishable from those in *Kurokawa-Lasciak*. There is no evidence here that Ms. Helton's authority over the vehicle was limited by Defendant. Defendant gave her the keys and asked her to move the Malibu, but there is no evidence in the record that shows any limitations were placed by Defendant on Ms. Helton's use of or access to the vehicle. Ms. Helton, in fact, later began driving the Malibu as if it were her own, after her vehicle was seized by the police. While Ms. Helton's later use of the Malibu would not go toward establishing her apparent authority, as apparent authority is based on what the officers knew at the time of the search, it would tend to show that she had actual authority over the vehicle. When the defendant in *Kurokawa-Lasciak* gave the keys to his girlfriend, he specifically told her to "stay put" at the casino and wait for him, while in the instant case Defendant actually told Ms. Helton to move the vehicle into the driveway, and did not place any limitations on her use. The officers would have no reason to doubt Ms. Helton's authority to consent to the search of the car, as they knew she had been given the keys by Defendant, had

driven the Malibu at his instruction, and had acted as if she had authority over the car by keeping the keys at her home, retrieving the keys, and unlocking and opening its door for the search.

Under the totality of the circumstances, I **FIND** that Ms. Helton had at least apparent, if not actual, authority to consent to the search of the Malibu. Defendant has not suggested, nor is there anything about, Ms. Helton's age or intelligence, the length and intensity of the questioning, or any other circumstances that indicate her consent was not knowing, intelligent and voluntary. I also **FIND** the officers relied in good faith upon what reasonably appeared to be Ms. Helton's apparent, if not actual, authority to consent to the search. I therefore **FIND** that the search of the Malibu did not violate the Fourth Amendment's prohibition on warrantless searches, because the government has met its burden to prove valid consent for the search. Because the search was legal, the Court need not address whether the evidence acquired by the officers after the search, namely Defendant's statement, should be suppressed as fruit of the poisonous tree. The tree itself (the search) is not poisonous, and thus neither is the fruit.

## III. CONCLUSION

After having considered all evidence, testimony, and argument in this case, for the reasons stated above, I **RECOMMEND**[3] that Defendant's motion to suppress [Doc. 34] be **DENIED**.

s/ *Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[3] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).